UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES DISTRICT COURT
FILED
DEC 2 2 2025
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

JOSEPH M. FUSCO III,

   *Plaintiff,*

  *v.*

MONROE COUNTY, NEW YORK,

   *Defendant.*

25-CV-6505-MAV

MOTION FOR RECONSIDERATION

Plaintiff moves for reconsideration under Rule 59(e) based on three errors.

First, the briefing schedule. On November 21, 2025, this Court ordered: "Plaintiff may file a reply... by January 3, 2026." ECF No. 16. On December 18, 2025, the Court dismissed—sixteen days before Plaintiff's deadline. Plaintiff never got to respond to Defendant's opposition. Attached as Exhibit 2 is the reply the Court never saw.

Second, *Rooker-Feldman.* The doctrine bars review of "state-court judgments rendered before the district court proceedings commenced." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Plaintiff filed this action on September 23, 2025. The filing restriction was imposed on October 14, 2025. The restriction post-dates the federal filing. *Rooker-Feldman* therefore cannot apply.

Third, the controlling authority. *Safir v. U.S. Lines, Inc.*, 792 F.2d 19 (2d Cir. 1986), requires five procedural safeguards before restricting court access. Plaintiff raised *Safir* in his November 26 opposition. ECF No. 17 at 5-6. The County has filed four

1

briefs. This Court has issued two substantive orders. Neither has cited *Safir*. The controlling Second Circuit authority on filing restrictions has never been addressed.

## QUESTIONS PRESENTED

1. Whether the Court ruled before the briefing schedule it set was complete.

2. Whether *Rooker-Feldman* applies to an order issued after the federal case was filed.

3. Whether *Safir* was addressed before dismissal of the *Safir* claim.

Plaintiff requests that the Court reconsider its December 18 Order, review the attached materials (Exhibits 1-3), deny Defendant's motion to dismiss, and grant Plaintiff's motion for preliminary injunction.

Respectfully submitted,

Dated: December 22, 2025

      Rochester, New York

Joseph M. Fusco III, *Pro Se*
211 West Bloomfield Road
Pittsford, New York 14534
Telephone: (585) 317-1707
Email: hello@josephfus.co

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSEPH M. FUSCO III,

       *Plaintiff,*

     *v.*

MONROE COUNTY, NEW YORK,

       *Defendant.*

25-CV-6505-MAV

DECLARATION OF JOSEPH M. FUSCO III
IN SUPPORT OF
MOTION FOR RECONSIDERATION

I, Joseph M. Fusco III, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I am the Plaintiff in this action. I submit this declaration in support of my Motion for Reconsideration under Rule 59(e).

2. On November 21, 2025, this Court issued a Scheduling Order (ECF No. 16) setting the following deadlines: Defendant's opposition to my preliminary injunction motion due December 17, 2025; my reply due January 3, 2026.

3. Defendant filed its opposition on December 15, 2025 (ECF No. 18).

4. The Court dismissed this action on December 18, 2025—sixteen days before my reply deadline.

5. I was preparing my reply when the dismissal issued. The Court never saw it.

6. Attached as Exhibit 1 is a true and correct copy of my email correspondence with the state court dated December 8, 9, and 16, 2025. This correspondence

1

documents my attempt to use the permission pathway and its failure to produce any result.

7. Attached as Exhibit 2 is a true and correct copy of my Reply Memorandum in Further Support of Motion for Preliminary Injunction—the reply I was preparing when the Court dismissed.

8. Attached as Exhibit 3 is a true and correct copy of my Declaration in Further Support of Motion for Preliminary Injunction, which authenticates Exhibit 1.

9. I have been separated from my twelve-year-old daughter since October 14, 2025—now 69 days.

10. I have been displaced from my home since January 10, 2025—now 347 days.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated: December 22, 2025

      Rochester, New York

Joseph M. Fusco III, *Pro Se*
211 West Bloomfield Road
Pittsford, New York 14534
Telephone: (585) 317-1707
Email: hello@josephfus.co



**From:** hello@josephfus.co
**Subject:** Re: Request for Permission to File Verified Complaint
**Date:** December 16, 2025 at 4:58 PM
**To:** Tracey Hilderbrandt thilderb@nycourts.gov
**Cc:** Lovely Warren lwarren@lovelywarrenlaw.com, lisa@siragusalawoffice.com, Kristen Porpora KPorpora@siragusalawoffice.com, Kyle Steinebach kyle@stowelegal.com, Cassandra A. Guthrie caguthri@nycourts.gov

Ms. Hilderbrandt,

Thank you for your December 9th response directing me to raise the Verified Complaint at today's conference. I did. The Court did not address it.

For the record: a Verified Complaint is a foundational pleading, not a motion. I have now raised this issue multiple times and remain without a path forward.

Respectfully,
Joseph M. Fusco III

On Dec 9, 2025, at 2:44 PM, Tracey Hilderbrandt <thilderb@nycourts.gov> wrote:

Mr Fusco you can address the filing of a Verified Complaint and Affirmation issue with Judge Gallagher during the 12/16/25 @ 1:30 TEAMS appearance.

Thank you

Tracey Hilderbrandt
Secretary to Hon John B Gallagher, Jr

---

**From:** hello@josephfus.co <hello@josephfus.co>
**Sent:** Monday, December 8, 2025 5:36 PM
**To:** Tracey Hilderbrandt <thilderb@nycourts.gov>
**Cc:** Lovely Warren <lwarren@lovelywarrenlaw.com>; lisa@siragusalawoffice.com; Kristen Porpora <KPorpora@siragusalawoffice.com>; kyle@stowelegal.com
**Subject:** Request for Permission to File Verified Complaint
**Importance:** High

Ms. Hilderbrandt,

Pursuant to the Court's October 14, 2025 directive, I request leave to file the attached Verified Complaint and Affirmation via NYSCEF. This filing falls outside Mr. Steinebach's assigned scope.

Respectfully,
Joseph M. Fusco III

Please be CAREFUL when clicking links or opening attachments from external senders.

EXHIBIT 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSEPH M. FUSCO III,

*Plaintiff,*

v.

MONROE COUNTY, NEW YORK,

*Defendant.*

25-CV-6505-MAV

PLAINTIFF'S REPLY MEMORANDUM
IN FURTHER SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

---

## PRELIMINARY STATEMENT

The County's opposition confirms the access-to-courts violation it denies. The County argues Plaintiff can access state court remedies—then describes a November 21, 2025 hearing that occurred without Plaintiff. The County says Plaintiff can file appeals—but never explains how a litigant under total filing restriction files an appeal. The County argues Plaintiff "has counsel"—but ignores that counsel's limited appointment cannot address the procedural orders at issue.

The County has now filed three substantive briefs in this litigation. None cites *Safir v. U.S. Lines*, Inc., 792 F.2d 19 (2d Cir. 1986)—the controlling Second Circuit authority on filing restrictions. Three briefs. Zero citations to the governing legal standard.

Since the County filed its opposition, Plaintiff has tested the "permission" pathway the County invokes. On December 8, 2025, Plaintiff requested permission to file a Verified Complaint. He was directed to raise it at a December 16 conference. He did.

The Court did not address it. Plaintiff remains without a path forward. The permission mechanism does not function.

The County's own evidence defeats its arguments. Its opposition proves that state proceedings continue without Plaintiff's participation, that counsel cannot remedy the access denial, and that the County knows the difference between having a case on a docket and having access to that case. The motion should be granted.

## ARGUMENT

### I.

### The County Has Filed Three Briefs and Cited *Safir* Zero Times

Plaintiff's core claim is straightforward: Monroe County ministerially enforces a filing restriction imposed without the procedural safeguards the Constitution requires. The Second Circuit held in *Safir* that before restricting a litigant's court access, due process requires consideration of five factors:

> [T]he district court, in determining whether or not to restrict a litigant's future access to the courts, should consider the following factors: (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.
>
> *Safir*, 792 F.2d at 24.

The October 14, 2025 filing restriction satisfies none of these factors. No motion sought the restriction. No party requested it. No findings supported it. No alternatives were considered. No pathway for meritorious claims was preserved.

Regarding the simultaneously-issued Order of Protection, the state court judge stated on the record:

> [T]here was no request for an order of protection by anybody in this courtroom today that I'm aware of.... I have ordered it. Okay? So nobody here besides me.
>
> Oct. 14 Tr. at 16.

The filing restriction was issued in the same breath, with even less process.

The County has now filed three substantive briefs in this litigation: its original motion to dismiss (ECF No. 6), its second motion to dismiss (ECF No. 15), and its opposition to Plaintiff's preliminary injunction motion (ECF No. 18). None cites *Safir*. None addresses the five-factor test. None explains how a restriction imposed sua sponte, without findings, without hearing, without consideration of alternatives, and without any pathway for meritorious claims satisfies due process.

This silence is telling. The County cannot defend the restriction's procedural validity, so it ignores the issue entirely. But *Safir* does not disappear because the County declines to address it. The restriction facially fails constitutional requirements, and the County's ministerial enforcement of that facially deficient restriction is independently actionable under § 1983.

## II.

### The County's Own Logic Proves the Access Violation

The County argues that Plaintiff's requested injunction cannot remedy his parental rights injury because it "would not disrupt valid orders" or "invalidate any existing order." Def. Opp. at 8. The County reasons that if the injunction won't affect the Order of Protection, then Plaintiff has not shown irreparable harm warranting injunctive relief.

This argument proves Plaintiff's claim. The County has identified the precise catch-22 that constitutes the access violation: If Plaintiff asks to invalidate state court orders, the County invokes Rooker-Feldman. If Plaintiff asks for prospective relief that doesn't affect existing orders, the County argues the relief won't help. If Plaintiff tries to challenge orders in state court, the filing restriction blocks access. If Plaintiff argues the filing restriction denies access, the County says state remedies are available.

Every door is locked. That is the access-to-courts violation. The County's argument that Plaintiff cannot win in federal court and cannot access state court is not a defense—it is an admission.

The remedy Plaintiff seeks is access—the ability to challenge orders through some forum. The requested injunction requires only that before the County Clerk records an order affecting parental rights or property, the Clerk verify that a motion appears on the docket and that proof of service exists. This takes approximately sixty seconds per order. The audit-and-notice provisions inform affected parties of procedural defects so they can seek state court remedies. This Court need not

invalidate any order; it need only restore the pathway to challenge orders that the County's practices eliminated.

III.

"Having Counsel" Is Not "Having Access"

The County repeatedly invokes the fact that Plaintiff "has counsel" and that counsel participated in hearings. Def. Opp. at 5, 7, 10. This fundamentally misunderstands the access problem.

Attorney Kyle R. Steinebach, Esq. was appointed to represent Plaintiff for custody and visitation matters only. The state court confirmed this limitation on the record:

> The only thing we're dealing with right now is custody and visitation....
> You are represented by Mr. Steinebach. All we're dealing with right
> here is custody and visitation.
> Oct. 14 Tr. at 8-9.

His appointment does not authorize him to challenge the January 10, 2025 exclusive use order (a property matter), challenge the October 14, 2025 filing restriction itself, file motions addressing procedural violations outside custody and visitation, or appeal orders that fall outside the scope of his limited appointment.

The County's November 21, 2025 hearing transcript proves the point. Mr. Steinebach attended that hearing—but on matters within his limited scope. The County does not claim Mr. Steinebach can challenge the filing restriction or the property orders. The County does not explain how Plaintiff can contest orders outside counsel's appointment. The County simply observes that counsel exists, as if that observation answers the access question.

5

A litigant with limited-scope counsel who cannot file pro se has access to nothing outside counsel's scope. That is Plaintiff's situation. The result is complete denial of access to challenge those orders.

IV.

The "Permission" Pathway Does Not Function

The County argues Plaintiff has appellate remedies under CPLR § 5701(a)(3) and § 5701(c). The County's theory is that Plaintiff can file if he simply requests permission under the October 14 restriction. This theory fails both logically and empirically.

A. The Logic: An Inescapable Loop

CPLR § 5701(a)(3) requires first filing a motion to vacate or modify the order. Only after that motion is denied can the litigant appeal. But filing a motion requires filing—which the October 14 restriction prohibits without permission. And obtaining permission requires filing a request for permission—which the restriction also prohibits.

The County does not explain how Plaintiff escapes this loop. The County does not identify any mechanism by which Plaintiff can file the motion to vacate that § 5701(a)(3) requires.

B. The Evidence: Documented Failure

Since the County filed its opposition, Plaintiff has tested the permission pathway. The results are documented.

On December 8, 2025, Plaintiff emailed the Court's secretary requesting leave to file a Verified Complaint—a foundational pleading that falls outside assigned counsel's scope. On December 9, 2025, the secretary responded:

> "Mr Fusco you can address the filing of a Verified Complaint and Affirmation issue with Judge Gallagher during the 12/16/25 @ 1:30 TEAMS appearance."

On December 16, 2025, Plaintiff attended the conference and raised the issue as directed. The judge moved to other matters without ruling on Plaintiff's request. Plaintiff remains without permission to file.

This is not hypothetical denial—it is documented denial. Plaintiff followed the permission procedure exactly as the County's theory requires. He requested permission. He was directed to raise it at a hearing. He raised it. Nothing happened. A Verified Complaint—a foundational pleading that initiates claims—remains unfiled because the permission mechanism produces no result.

*Safir* requires that filing restrictions preserve "a pathway for meritorious claims." 792 F.2d at 24. A pathway that leads nowhere preserves nothing.

### C. Ineffective Remedies Do Not Count

The Supreme Court has recognized that "remedies that are 'ineffective' should not be counted." Ross v. Blake, 578 U.S. 632, 642 (2016). A remedy is unavailable when officials "thwart [litigants] from taking advantage of it." Id. at 643. The permission pathway thwarts Plaintiff from accessing CPLR § 5701 remedies. Those remedies are therefore unavailable as a matter of law.

## V.

### The November 21, 2025 Hearing Proves the Access Denial

The County attached a transcript from a November 21, 2025 state court hearing as evidence that Plaintiff has access to state proceedings. Def. Opp. Exh. 1. The transcript proves the opposite.

The transcript shows that the County's counsel attended and argued the County's motion to unseal, that Mrs. Fusco's counsel attended and participated, that Plaintiff's limited-scope counsel attended on matters within his scope—and that Plaintiff was not present.

The County speculates that Plaintiff "was allowed to attend" despite his absence. Nelson Aff. ¶6. But "being allowed to attend" a hearing is not "having access to courts." A litigant who cannot file papers, cannot submit motions, and cannot obtain relief through any procedural mechanism does not gain "access" by sitting in a gallery watching others participate.

Plaintiff's absence from the November 21 hearing resulted from the displacement and instability caused by the very orders he seeks to challenge—displacement that has left him without stable housing for over 340 days and exacerbated documented ADHD that affects executive function and scheduling. The County's enforcement of procedurally deficient orders created conditions that made attending a hearing difficult, then cites Plaintiff's absence as evidence he has access. This is circular.

More fundamentally, even if Plaintiff had attended, he could not have filed anything at that hearing. He could not have presented a motion to vacate void orders. He

could not have requested relief outside counsel's limited scope. Physical presence in a courtroom is not access to courts when the litigant remains prohibited from filing papers that invoke the court's jurisdiction.

The County's evidence thus proves what Plaintiff alleges: state proceedings continue while Plaintiff is excluded from meaningful participation. The County accessed the very forum from which Plaintiff is barred—and offers that access disparity as evidence that Plaintiff has access.

## VI.

### The County's *Matthews v. Eldridge*
### Argument Misses the Point

The County argues Plaintiff failed to apply the *Matthews v. Eldridge*, 424 U.S. 319 (1976), framework for procedural due process claims. Def. Opp. at 6. This misunderstands the claim.

*Safir* provides the specific framework for filing restrictions. The Second Circuit developed the five-factor *Safir* test precisely because access-to-courts restrictions implicate distinct due process concerns requiring distinct procedural safeguards. *Matthews* provides a general framework; *Safir* provides the specific application of that framework to filing restrictions.

In any event, the threshold question is whether the filing restriction was validly imposed. A restriction that fails *Safir* is constitutionally deficient regardless of *Matthews* balancing. The County does not argue the restriction satisfies *Safir*. It cannot, because the restriction facially fails every *Safir* factor.

## CONCLUSION

The County's opposition confirms rather than refutes the access-to-courts violation. The County describes state proceedings continuing without Plaintiff. The County identifies appellate remedies Plaintiff cannot access. The County invokes counsel whose limited scope cannot address the orders at issue. And for the third consecutive brief, the County ignores *Safir*—the controlling authority on the constitutional requirements for filing restrictions.

Since the County filed its opposition, Plaintiff has documented that the permission pathway does not function. Request permission. Get directed to a hearing. Raise it. Nothing happens. This is not access.

Plaintiff has been separated from his daughter for 64 days under an Order of Protection issued without motion. He has been displaced from his home for 343 days under an exclusive use order issued without motion. He has been blocked from filing papers for 65 days under a restriction that satisfies none of the *Safir* factors. These harms are ongoing and irreparable.

Plaintiff has demonstrated: (1) likelihood of success on a claim the County cannot answer; (2) irreparable harm from ongoing denial of access, parental separation, and property deprivation; (3) minimal burden on the County—sixty seconds of verification per order; and (4) public interest in ensuring Monroe County's 740,000 residents have meaningful court access.

The motion for preliminary injunction should be granted.

Respectfully submitted,

Dated: December 18, 2025

      Rochester, New York

Joseph M. Fusco III, *Pro Se*
211 West Bloomfield Road
Pittsford, New York 14534
Telephone: (585) 317-1707
Email: hello@josephfus.co

EXHIBIT 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSEPH M. FUSCO III,

     *Plaintiff,*

    *v.*

MONROE COUNTY, NEW YORK,

     *Defendant.*

25-CV-6505-MAV

DECLARATION OF JOSEPH M. FUSCO III
IN FURTHER SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

---

I, Joseph M. Fusco III, pursuant to 28 U.S.C. § 1746, declare under penalty of
perjury that the following is true and correct:

1. I am the Plaintiff in this action. I submit this declaration in further support
   of my Motion for Preliminary Injunction and in reply to the Defendant's
   opposition.

2. Attached hereto as Exhibit 1 is a true and correct copy of my email
   correspondence with Tracey Hilderbrandt, Secretary to Hon. John B.
   Gallagher Jr., dated December 8, 9, and 16, 2025.

3. On December 8, 2025, I emailed Ms. Hilderbrandt requesting leave to file a
   Verified Complaint and Affirmation via NYSCEF. This request was made
   pursuant to the Court's October 14, 2025 directive requiring permission
   before filing any papers.

4. On December 9, 2025, Ms. Hilderbrandt responded:

   > "Mr Fusco you can address the filing of a Verified Complaint and
   > Affirmation issue with Judge Gallagher during the 12/16/25 @
   > 1:30 TEAMS appearance."

1

5. On December 16, 2025, I attended the scheduled TEAMS conference and raised the Verified Complaint filing issue as directed. The judge moved to other matters without addressing or ruling on my request.

6. Immediately following the conference, I emailed Ms. Hilderbrandt documenting that I had raised the issue as directed and that the Court did not address it. That email is included in Exhibit 1.

7. As of the date of this declaration, I remain without permission to file the Verified Complaint. I have received no ruling, no written order, and no explanation.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated: December 18, 2025

      Rochester, New York

Joseph M. Fusco III, *Pro Se*
211 West Bloomfield Road
Pittsford, New York 14534
Telephone: (585) 317-1707
Email: hello@josephfus.co



Stein would have been discharged by ACJ regardless of the actions of the state. We recognize that such a determination may involve the taking of additional evidence and create a further imposition on the district court. Nonetheless, we think the Supreme Court's directive in *Carey* is clear and unequivocal. *See Huntley v. Community School Board*, 579 F.2d at 740. The district judge, therefore, should have instructed the jury to award only nominal damages if it found Stein would have been discharged by ACJ even had he received adequate notice of his disqualification proceeding from the state.

### CONCLUSION

 Accordingly, the judgment is reversed and the case remanded to the district court for proceedings consistent with this opinion.[5]



**Marshall P. SAFIR, Plaintiff-Appellant,**

v.

**UNITED STATES LINES INC., Lykes Bros. Steamship Co., Inc., Moore McCormack Lines, Inc., American President Lines, Ltd., Farrell Lines, Inc., American Export Lines, Inc., Prudential Lines, Inc., Prudential-Grace Lines, Inc., Defendants-Appellees.**

**Nos. 246, 790, Dockets 85–7481, 85–7815.**

United States Court of Appeals, Second Circuit.

Argued Jan. 29, 1986.

Decided May 27, 1986.





---

**5.** We believe the issue of nominal damages is "sufficiently distinct from the other issues that a separate trial may be had without injustice." *Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 756 (2d Cir.1984). Accordingly, the new trial should be limited to the damages issue.

*See Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931); *Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898, 906–07 (2d Cir.1982), *cert. denied,* 461 F.2d 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983); Fed.R.Civ.P. 59(a).

**20**



Marshall P. Safir, pro se.

Verne W. Vance, Jr., Boston, Mass. (Foley, Hoag & Eliot, Boston, Mass., of counsel) for defendant-appellee Farrell Lines, Inc.

William Schurtman, New York City (Gregory F. Hauser, Walter, Conston & Schurtman, P.C., New York City, of counsel), for defendant-appellee American Export Lines, Inc.

T.S.L. Perlman, Washington, D.C. (William H. Fort, Kominers, Fort, Schlefer & Boyer, Washington, D.C., of counsel), for defendant-appellee Lykes Bros. Steamship Co., Inc.

Robert T. Basseches, Washington, D.C. (William R. Hanlon, Shea & Gardner, Washington, D.C., of counsel), for defendant-appellee American President Lines, Ltd.

John N. McConnell, Jr., Washington, D.C. (Haight, Gardner, Poor & Havens, Washington, D.C., of counsel), for defendant-appellee U.S. Lines, Inc.

Before NEWMAN, KEARSE and MINER, Circuit Judges.

MINER, Circuit Judge:

This lawsuit marks yet another episode in Marshall Safir's quest to obtain additional relief for the wrongs committed in 1965 and 1966 against his now bankrupt shipping company. During that period, defendants and others engaged in predatory pricing practices for the sole purpose of forcing Safir's company, Sapphire Shipping Lines, Inc. ("Sapphire"), out of business. The instant suit is the eleventh federal court action that Safir or his defunct company has filed against the defendants relating to those pricing practices. Unlike two of Safir's earlier lawsuits, however, the current one lacks merit entirely.

## I. BACKGROUND

In early 1965, Sapphire began operations as an unsubsidized common carrier by water. Sapphire undercut the rates of various competitor carriers that were members of a shipping conference known as the Atlantic and Gulf American Flag Berth Operators ("AGAFBO"). The members of AGAFBO, by agreement, drastically reduced their rates to an admittedly unfair, unreasonable, and non-compensatory level. The sole purpose of these reductions was to drive Sapphire out of business. On March 1, 1966, AGAFBO raised its rates to their former levels. Sapphire, having already experienced irreversible setbacks, went out of business the following March and was adjudged a bankrupt that May.

In December of 1967, the Federal Maritime Commission issued a report finding that AGAFBO, by engaging in these pricing practices, had violated section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 (1982). At about this time, Safir commenced upon the litigious journey that brings him to our court today. First, in 1966, Sapphire instituted a "corporate treble damage suit" against the instant defendants and others, which ultimately was settled by the bankruptcy trustee with all defendants for approximately $2.5 million.

Safir also requested the Acting Maritime Administrator and the Maritime Subsidy Board to terminate subsidy payments to

members of AGAFBO and to institute action to recover subsidies paid during the period of illegal practices. The request was based on section 810 of the Merchant Marine Act of 1936, 46 U.S.C. § 1227 (1982). Eventually, Safir commenced suit in the Eastern District of New York seeking a declaration that section 810 barred subsidy payments and an order compelling the government to stop such payments and to take appropriate legal action to recover subsidies paid during the period of violation.

In our first encounter with the litigation stemming from the above-described events, we reversed the district court's dismissal of Safir's suit and held that his complaint stated a claim under section 810, that he had standing to prosecute that claim, and that the Maritime Administration could not decline to recapture past subsidies that were legally recoverable without making a considered decision to adopt that course. *Safir v. Gibson*, 417 F.2d 972 (2d Cir.1969), *cert. denied*, 400 U.S. 850, 91 S.Ct. 57, 27 L.Ed.2d 88 (1970) (*"Safir I"*).

Ultimately, the Secretary of Commerce directed recovery of approximately $1 million in subsidies paid to the four AGAFBO lines that had competed directly with Sapphire. The Secretary also affirmed the Maritime Administration's finding that the three AGAFBO lines that had not served the same routes as Sapphire had engaged in a "technical violation" of section 810, but nevertheless should not be required to repay subsidies that they had received during the period of violation. Safir appealed the Secretary's order to the United States District Court for the District of Columbia, arguing that the Secretary should recover all subsidies paid during the period of violation (more than $225 million). Safir's appeal was dismissed on the ground that he lacked standing, since it had become clear that he was not likely ever again to be in competition with the carriers that had engaged in the wrongful practices. *Safir v. Dole*, 718 F.2d 475 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984).

Had the above claims represented the totality of Safir's legal battle against these defendants, this case would be unexceptional. Over the years, however, Safir has multiplied the number of legal proceedings aimed at redressing the injuries suffered by Sapphire. Many of these proceedings sought to enjoin various business transactions of defendants on the ground that such transactions would deplete defendants' assets and thereby deprive Safir of the recovery he ultimately might receive against them. Safir's legal strategy at times has been novel and occasionally successful, but by and large it has been meritless, duplicative, and burdensome to the defendants and the courts.

Safir commenced the instant action against United States Lines, Inc., Lykes Bros. Steamship Co., Inc., Moore McCormack Lines, Inc., American President Lines, Ltd., Farrell Lines, Inc., American Export Lines, Inc., Prudential Lines, Inc., and Prudential Grace Lines, Inc., alleging an implied private right of action under section 810 of the Merchant Marine Act of 1936, 46 U.S.C. § 1227 (1982), to pursue a "restitutionary remedy in the form of disgorgement of the illegal earnings" that defendants had received as subsidy payments in 1965 and 1966. Safir also sought a preliminary injunction preventing Farrell from taking any action to sell the *S.S. Austral Lightning*, or in the alternative, requiring Farrell to set aside the proceeds of the sale pending a decision on the merits.

The United States District Court for the Eastern District of New York (Nickerson, J.) denied Safir's motion for a preliminary injunction on the grounds that Safir had not established either "a likelihood of success on the merits" or "a sufficiently serious ground for litigation and a balance of hardships tipping decidedly in [his] favor." The district court subsequently dismissed Safir's complaint on the ground that section 810 does not afford private citizens a private right of action for "restitution" of subsidies paid by the government, *Safir v. United States Lines, Inc.*, 616 F.Supp. 613,

615–17 (E.D.N.Y.1985), and it denied his post-judgment motion for leave to amend his complaint to state a claim under section 810, in his individual capacity, for treble damages. Finally, the district court permanently enjoined Safir from (1) proceeding further in the instant action except to seek appellate review or a writ of certiorari, or to submit papers responding to applications by defendants and (2) asserting in any federal court any new claims related to, or arising out of, the events of 1965 and 1966. We fully agree with the district court's denial of Safir's preliminary injunction motion and its dismissal of Safir's complaint. We also agree with the district court that an injunction restricting Safir's future federal litigation was warranted; however, we believe the injunction, as it presently stands, is more restrictive than the circumstances require. Accordingly, we affirm the judgment of the district court but modify the injunction to provide only that no new federal action, motion, petition, or proceeding arising out of, or relating to, the events of 1965 and 1966 may be brought by Safir without first obtaining leave of court.

## II. DISCUSSION

### A. *Private Right of Action Under Section 810*

Safir's claim for restitution of subsidies paid to defendants rests entirely on the contention that the remedy he seeks is available by way of a private action under section 810. It is no longer open to question that defendants' pricing practices in 1965 and 1966 violated the statute. *Safir v. Gibson*, 432 F.2d 137 (2d Cir.), *cert. denied* 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970) ("Safir II"). The second paragraph of section 810 provides appropriate remedies for such violations. First, it allows a public remedy, *viz.*, that "[n]o payment or subsidy of any kind shall be paid directly or indirectly out of funds of the United States ... to any contractor or charterer who shall violate this section." We previously have interpreted this statutory language to authorize the government to recover subsidies or payments made during a period of violation. *Safir I*, 417 F.2d at 977. More pertinent to our consideration, however, is the private remedy provided by section 810. The statute specifically provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden by this section may sue therefor ... and shall recover threefold the damages by him sustained...."

Since section 810 does not specifically afford Safir the additional private remedy he is pursuing here, the dispositive question on this appeal is whether such a private remedy is implicit in the statutory scheme. Where a statute expressly provides for particular remedies, as section 810 does, courts are disinclined to read others into it. *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19–20, 100 S.Ct. 242, 246–47, 62 L.Ed.2d 146 (1979); *see generally Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) (setting forth four factors considered pertinent in determining whether a private remedy is implicit in a statute not expressly providing one). In the absence of strong indications of congressional intent to permit unexpressed remedies, we are compelled to conclude "that Congress provided precisely the remedies it considered appropriate." *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981).

The history of the Merchant Marine Act, and of section 810 in particular, provides no support for Safir's argument that private litigants are entitled to relief beyond treble damages for actual injury. The Act established a program to subsidize American-Flag Carriers, its stated purpose being "to foster the development and encourage the maintenance of" a merchant marine sufficient to carry the United States waterborne commerce at all times and capable of serving as a naval and military auxiliary in times of war or national emergency. *See* 46 U.S.C. § 1101 (1982); *American Export Isbrandtsen Lines, Inc. v. United States*, 499 F.2d 552, 558 (Ct.Cl.1974). Subsidies

were provided in order to enable American-Flag carriers to compete successfully with foreign carriers. At the same time, those subsidies never were intended to give some American shippers a competitive advantage over other American shippers. Thus, section 810 provided comprehensive remedies for potential abuses of the subsidy system. The public remedy, by cutting off subsidy payments and allowing the government the option of recovering subsidies paid during a period of violation, effectively prevents a carrier from reaping benefits while violating the statute. The public remedy also permits the United States government to apply the recovered subsidies in a manner consistent with the purposes of the Act. At the same time, the private remedy explicitly provided for in the Act sufficiently redresses any injury that a private party might suffer.

In passing the Act, Congress focused specifically on the matter of remedies for victims of unfair practices. Senator O'Mahoney, after discussing the case of a subsidized American carrier that took part in putting an unsubsidized American carrier out of business, introduced an amendment, enacted as section 810, to make clear Congress' intent not to pay subsidies to lines that acted to crush American competition. He said:

> In order to give an opportunity to those who may be injured by illegal combinations of the kind I have described to protect themselves I have incorporated in this amendment the principle of section 4 of the Clayton Act which permits the victim of such unfair practices to sue for treble damages.

80 Cong.Rec. 10076 (1936) (quoted in *Safir I*, 417 F.2d at 977). We find this evidence persuasive support for our conclusion that had Congress intended to allow private litigants to recover past subsidies, it would have said so.

In so holding, we do not ignore our earlier decision, in which we held that section 810's public remedy implicitly includes a governmental right to recover past subsidies. *Safir I*, 417 F.2d at 977. Our interpretation of the public remedy, which we believed necessary to effectuate the statutory scheme, does not support the view that there should be an expansion of the private remedy. Allowing a private litigant to recover subsidies paid to carriers that engage in violations of section 810 is neither necessary to the statutory scheme nor likely to further the purposes of the Act.

When faced with congressional silence, ambiguous language or conflicting statements, we sometimes have found it necessary to engage in a searching analysis of a statute in order to ascertain the true intent of Congress. Here, we are faced with clear statutory language, supportive legislative history and a comprehensive statutory scheme. Accordingly, we reject Safir's claim to recover the subsidies paid to defendants. In light of this conclusion, we need not address Safir's appeal of the denial of a preliminary injunction.

B. *Restrictions Imposed On Future Litigation*

Judge Nickerson permanently enjoined Safir from:

> (1) proceeding further in this action except to (a) seek appellate review by the Court of Appeals, (b) apply for *certiorari* to the Supreme Court, and (c) submit papers responding to applications, if any, by defendants and (2) instituting in any federal court, including bankruptcy courts, any new action, motion, petition or proceeding arising from or related to defendants' pricing practices in 1965 and 1966 or their then receipt of merchant marine subsidies.

On appeal, Safir contends that the injunction was improper because he is not abusing the judicial system, but only attempting in good faith to vindicate his rights through the legal process. We cannot agree.

█ That the district court possessed the authority to enjoin Safir from further vexatious litigation is beyond peradventure. 28 U.S.C. § 1651(a); *Abdullah v. Gatto*, 773 F.2d 487, 488 (2d Cir.1985) (per curiam); *In*

*re Martin-Trigona,* 737 F.2d 1254, 1262 (2d Cir.1984); *In re Hartford Textile Corp.,* 681 F.2d 895, 897 (2d Cir.1982) (per curiam), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1195, 75 L.Ed.2d 439 (1983); *Ward v. Pennsylvania New York Central Transportation Co.,* 456 F.2d 1046, 1048 (2d Cir.1972). "A district court not only may but should protect its ability to carry out its constitutional functions against the threat of onerous, multiplicitous, and baseless litigation." *Abdullah,* 773 F.2d at 488 (citing *Martin-Trigona,* 737 F.2d at 1262).

■ As our prior cases have indicated, the district court, in determining whether or not to restrict a litigant's future access to the courts, should consider the following factors: (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties. Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties.

Looking to these factors, we have no doubt that the circumstances here called for some restriction on Safir's future federal litigation. For twenty years, Safir has sought redress in the federal courts for those pricing practices of defendants which occurred in 1965 and 1966. Admittedly, some of Safir's lawsuits, far from being frivolous, were meritorious. Nevertheless, he has repeatedly asserted the same claims in slightly altered guise and has used the courts to block and hinder various business transactions of the defendants.

Significantly, most of Safir's claims have been resoundingly rejected by the courts. For instance, Safir *failed* to persuade the courts (1) that section 810 required the maritime officials to recover *all* subsidies paid to the violating carriers during the period of violation, *Safir II,* 432 F.2d at 140–42, or any subsidies paid to the non-competing carriers, *id.* at 145 n. 2; *Safir v. Kreps,* 551 F.2d 447, 453–54 (D.C.Cir.), *cert. denied,* 434 U.S. 820, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977); (2) that the involved shipping lines were barred perpetually from receiving subsidies even after their unlawful conduct ceased, *Safir II,* 432 F.2d at 140; (3) that he was entitled to pursue a claim under the False Claims Act, *Safir v. Blackwell,* 579 F.2d 742, 745 (2d Cir.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979); (4) that he had standing to appeal the Secretary of Commerce's decision on the amount the subsidies properly recovered, *Safir v. Dole,* 718 F.2d at 479–81; or (5) that he may share in the government's recovery of subsidies on a "common fund" theory, *id.* at 480. More important, Safir has continued to assert many of these same claims after their rejection.

In addition, some of Safir's somewhat novel litigation tactics can only be characterized as senseless and unduly burdensome. He moved to dismiss one appeal on the ground that the defendants had conspired to bribe President Nixon to defeat his litigation. He also sought to discover the "Nixon tapes" in the belief that officials in the Nixon administration conspired with the defendants to prevent him from vindicating his rights. In another action, he sought to have the judge disqualified because he allegedly was a friend of President Nixon.

Similarly, Safir has sought collateral relief *pendente lite* in many of his actions, including this one, alleging that the defendants were dissipating their assets to prevent him from enforcing potential multi-million dollar judgments. In this regard, he has sought to enjoin the sale of ships, shares of stock and other assets and to have proceeds of such sales placed in escrow; to enjoin a stockholder's meeting; and to enjoin the government from paying

subsidies to the defendants and from approving the sale of stock in which neither the buyer nor the seller were defendants in Safir's actions. In light of the patently meritless nature of these motions, they can be viewed only as attempts by Safir to harass the defendants.

Another example of such harassing and baseless litigation was more recently displayed when Safir brought involuntary bankruptcy proceedings against four of the defendants. That action was predicated on the untenable theory that because Safir was about to win prodigious judgments from the defendants, they would be unable to satisfy the claims and be forced into bankruptcy. The bankruptcy court found Safir's petition to be a clear abuse of the judicial process, and assessed costs and attorneys' fees against Safir. To date, Safir has not paid those costs or fees.

We therefore cannot ignore the obvious fact that mere dismissal of this action will not hinder Safir from initiating further similar proceedings. Safir's abuse of the judicial process, despite his subjective conviction that he has suffered an unremedied injury, cannot be countenanced. In addition, Safir's failure to pay costs and fees already assessed against him indicates that other types of sanctions would be unavailing. Accordingly, we hold that the district court was fully justified in permanently enjoining Safir from instituting further vexatious, harassing or repetitive proceedings arising out of the 1965–1966 pricing practices of defendants.

■ Nevertheless, the injunction, which precludes Safir from instituting any action whatsoever, is overly broad. Although we are unable to divine any relief still available to Safir arising out of, or relating to, those events, we do not wish to foreclose what might be a meritorious claim. Consequently, we modify the injunction to provide that Safir is prevented only from commencing additional federal court actions relating in any way to defendants' pricing practices or merchant marine subsidies during the 1965–1966 period without first obtaining leave of the district court. *Cf. Ab-*

*dullah*, 773 F.2d at 488; *Martin-Trigona*, 737 F.2d at 1262.

### C. *Safir's Motion to Amend His Complaint*

After judgment was entered in this case, Safir moved for permission to file an amended complaint. Despite the mandate of Fed.R.Civ.P. 15(a), that leave to amend a pleading "shall be freely given when justice so requires," we find that Judge Nickerson did not abuse his discretion in denying Safir's request. *See generally Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (enunciating standard to be employed under Rule 15(a)).

### III. CONCLUSION

For the reasons stated above, we affirm the judgment of the district court, as modified.



**UNITED STATES DEPARTMENT OF JUSTICE and Department of Justice Bureau of Prisons (Washington, D.C.) and Federal Correctional Institution (Danbury, Connecticut), Petitioners, Cross-Respondents,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent, Cross-Petitioner.**

**Nos. 844, 922, Dockets 85–4167, 85–4179.**

United States Court of Appeals, Second Circuit.

Argued Feb. 27, 1986.

Decided May 30, 1986.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOSEPH M. FUSCO III,

      *Plaintiff,*

    *v.*

MONROE COUNTY, NEW YORK,

      *Defendant.*

25-CV-6505-MAV

CERTIFICATE OF SERVICE

_____

I hereby certify that on December 22, 2025, I filed the following documents with the Clerk of the United States District Court for the Western District of New York via the Court's CM/ECF system:

1. Motion for Reconsideration
2. Declaration in Support of Motion for Reconsideration
3. Exhibit 1: Email Correspondence (December 8, 9, 16, 2025)
4. Exhibit 2: Plaintiff's Reply Memorandum in Further Support of Motion for Preliminary Injunction
5. Exhibit 3: Declaration of Joseph M. Fusco III in Further Support of Motion for Preliminary Injunction

The CM/ECF system will provide electronic notification and service upon counsel for Defendant:

    Zachary Tyler Nelson, Esq.
    Monroe County Department of Law
    39 West Main Street, Room 307
    Rochester, NY 14614

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 22, 2025.

    Rochester, New York

_____

Joseph M. Fusco III, Pro Se
211 West Bloomfield Road
Pittsford, New York 14534
Telephone: (585) 317-1707
Email: hello@josephfus.co